[No. B216252. Second Dist., Div. Eight. June 17, 2010.]

MATTHEW DONALD THOMPSON, Plaintiff and Appellant, v.
CITY OF MONROVIA, Defendant and Respondent.

COUNSEL

Law Offices of Leo James Terrell and Leo James Terrell for Plaintiff and Appellant.

Liebert Cassidy Whitmore, J. Scott Tiedemann and Judith S. Islas for Defendant and Respondent.

OPINION

**GRIMES, J.**—Appellant Matthew Donald Thompson (Thompson) is a White police officer who has been employed by the City of Monrovia Police Department (Department) since 1997. In 2008, he sued the Department for harassment and hostile work environment arising from offensive remarks and behavior directed at an African-American colleague, retaliation for Thompson's reports of the misconduct, and failure to investigate his claims of harassment and retaliation. The trial court granted the Department's motion for summary judgment. We affirm.

## STANDARD OF REVIEW

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' . . . We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123], citations omitted (*Yanowitz*).) " 'We accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [105 Cal.Rptr.2d 652].)

A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (*o*)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his or her pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Id.*, § 437c, subd. (p)(2).) A triable issue of material fact exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Fn. omitted.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

## THE UNDISPUTED MATERIAL FACTS

Liberally construing the entire record in favor of Thompson, we accept the following facts as true.[1] Thompson began employment with the Department on August 3, 1997. At that time, new employees were employed as probationary employees for 18 months. Thompson's first performance evaluation was for the period August 3, 1997, through August 3, 1998. Thompson was told he needed to improve report writing, incident control, and investigations and to become knowledgeable of the law and its application. His department manager commented, "Matt, there are areas of this evaluation that require your immediate attention if you are to successfully pass probation."

---

[1] The parties do not challenge on appeal the trial court's rulings on the objections to evidence. In our discussion of the undisputed facts, we do not consider any testimony or exhibits that were found to be inadmissible by the trial court.

Thompson's second performance evaluation was for the period August 3, 1998, through February 3, 1999. Again, Thompson was told he needed to improve his knowledge of certain laws, policies and procedures and to improve his report writing. The evaluation noted that Thompson "occasionally overlooks serious errors in completeness of work," and he "requires supervision of all activities other than routine." This was supposed to have been the end of his probationary period, but in an effort to give Thompson "the necessary time to show you can do your job," his probation was extended six months to August 3, 1999.

Thompson's third performance evaluation was for the period August 3, 1999, through August 3, 2000. His department manager described this evaluation as "a very disturbing evaluation that need[s] your immediate attention and significant improvement." The evaluation stated Thompson often asked other officers how he should handle calls; he was "very slow in writing and submitting his reports"; over 44 percent of his reports had to be returned for corrections; and he "is extremely limited in his decision-making."

Consequently, the Department placed Thompson on a work improvement contract. The work improvement contract was initially contemplated to be for six months, from January 25, 2001, through July 22, 2001. The work improvement contract identified Thompson's areas of deficiency as "report writing/investigation, time management, and self-confidence/decision-making." The work improvement contract described in detail what Thompson needed to do to improve his performance.

Thompson's fourth performance evaluation was for the period January 31, 2001, through April 24, 2001. Thompson's performance had improved in report writing though he was advised to increase his activity and productivity in the enforcement of traffic regulations. The Department took Thompson off the work improvement contract on June 29, 2001, shortly before expiration of six months from its inception.

Thompson's fifth performance evaluation was for the period April 24, 2001, through April 24, 2002. Thompson's performance met expectations overall. He was still struggling with report writing and time management, but he had increased his productivity in the area of citations and arrests. Thompson's sixth performance evaluation was for the period April 24, 2002, through April 24, 2003. His performance met expectations overall but the same deficiencies were noted. His supervisor noted that "Matt needs to work on his time management. . . . It seemed that Matt was in the station typing reports most of the time. With Matt's tenure there should not be an issue of time management." His supervisor also observed that, "if Matt was to

manage his time better, he would be making more contacts on the street and maintain a higher level of proactive patrol."

Thompson's seventh performance evaluation was for the period April 24, 2003, through April 24, 2004. Thompson's overall performance was below expectations, defined as "inconsistent performance on criteria, falling short of what normally is expected—requires remedial attention." His supervisor, Donald Newton, described Thompson as a good and dependable officer but found that Thompson's report writing skills were still unacceptable. He observed that "[t]his issue has been documented in every evaluation that he has had," and, "it is time to fix the problem." Sergeant Newton explained, "Matt's report writing problem affects more than just him. The supervisor reading the report must take extra time and effort in reading and correcting each report. Then, the wait by everyone in the department (records, detectives, administration, etc.) for the reports to be finished puts an additional burden on the supervisor and Matt to complete the documentation." Sergeant Newton concluded, "If Matt is going to be successful in improving his time management skills, report writing skill and his productivity, he will need to seek schooling from an adult school that can teach him basic English skills."

Thompson's eighth performance evaluation was for the period April 24, 2004, through April 24, 2005. During this period, on May 17, 2004, the chief of police gave Thompson a commendation for his membership on the Department's 2005 Challenge Cup Relay Team. Thompson's overall performance met expectations, and he made improvements in his report writing skills. Sergeant Newton reported that Thompson was now meeting department expectations in the areas of report writing and time management. Thompson was encouraged to continue to improve in these areas because he was still below department and shift averages.

Thompson's ninth performance evaluation was for the period April 24, 2005, through April 24, 2006, during which his overall performance fell to below expectations. His supervisor, Lieutenant James Hunt, commented: "There are areas of concern that consistently surface with Ofcr. Thompson regardless of who the sergeant and lieutenant on his shift are. These areas include report writing skills, investigation skills, time management, and productivity. Mention is made from time to time that he had made improvements in his report writing skills. . . . However, this is not the case and I simply do not see where the improvement is. Even simple reports are often returned for corrections more than once for a number of reasons. He also has great difficulty completing reports in a timely manner. During the last rotation he was told, almost daily, to make sure his reports were completed and turned

in by 0600 hours. He would [unclear] to get them done but this would not be the case. Sometimes he would say that he wanted to stay busy in the field and would come in later to work on his reports. 'Staying busy' for Officer Thompson resulted in little or no self-initiated activity on his part and the reports not getting done. It was not due to him being overburden [*sic*] with work; he simply did not get them done. Officer Thompson is well aware that he is to get a supervisor's okay to hold reports until the next day. To make it appear that he was doing this, he would get some reports okayed to hold; however, with other reports, he just placed them in the hold basket without a supervisor's okay and without the supervisor's knowledge."

Lieutenant Hunt also found that "Thompson does not manifest the ability to extrapolate information and think outside the box." As an example, Hunt described a criminal threat investigation of a suspect whose first name and license plate were known to Thompson. Instead of running the license plate to get the suspect's full name and address, Thompson kept calling an ex-girlfriend of the suspect to try to get this information. Twelve or 13 days passed without Thompson submitting his report. Hunt finally ran computer checks on the suspect based on the information that Thompson had and obtained a match on the suspect. Hunt gave the information to Thompson for his report, and Thompson said, "[O]kay, you got me."

Hunt also noted that although Thompson was usually courteous to the general public, victims and suspects, he was often disrespectful, rude and sarcastic with his peers and coworkers. Several dispatchers complained about Thompson. One employee was nearly in tears after Thompson left an inappropriate and rude message on her cell phone. He left this message for her because she had called the dispatcher to report that a wanted parolee was inside a local business; Thompson was upset that he had to make the arrest, book the suspect, and transport him to county jail. Fellow officers on Thompson's shift reported to supervisors that he spoke disparagingly about his supervisors. Once, after it was pointed out to Thompson that he should complete field interview cards on four juveniles he detained in an area where the community was experiencing vandalism, Thompson said that he did not care what his supervisors thought. Hunt commented, "[N]ow even officers expected him to work, handle things right and not just get by."

Thompson was placed on a performance improvement program on May 24, 2006. The memorandum summarizing the program stated that it was meant to address "the obvious, namely that your issuance of 46 moving citations, your issuance of 51 non-moving citations, your completion of 23 Field Interview cards, your lack of investigative skills, your inability to complete reports on

time, your consistent inability to follow instructions, and your rude and sarcastic conduct toward other employees in the department for the period of April 24, 2005 to April 24, 2006 is under any criteria, indicative of you failing to meet reasonable Department expectations of performance and conduct." The performance improvement program identified the areas in which Thompson was required to improve his performance, including planning, time management, productivity, and interpersonal relationships.

Thompson alleged in this lawsuit that he was placed on the May 24, 2006, performance improvement program in retaliation for his stated intention to tell the truth about race discrimination in the Department. On appeal, Thompson asserts that he observed three incidents of racism before he was placed on the May 24, 2006, performance improvement program contract.[2] In March 2006, Thompson attended a police officer briefing during which Sergeant Newton referred to African-Americans as lazy, remarking that Blacks were brought over from Africa to the South and, to this day, they have not accomplished anything. Sergeant Newton then grunted and mimicked a monkey with his shoulders and arms. Thompson perceived this to be the most significant incident of race discrimination, and, chronologically, it was the last incident of racism about which he complains.

Sometime during the year before this March 2006 briefing, Thompson saw that someone had placed the racially offensive character of "Buckwheat" on the screen saver of the computer of Officer Glenn Cobb, an African-American. On another occasion before March 2006, Thompson heard a supervisor (he was uncertain who made the statement, but he believes it was Sergeant Wright) say that instead of celebrating the birthday of Martin Luther King, Jr., there should be a celebration of the birthday of James Earl Ray (the man who shot and killed Dr. King).

In his first amended complaint and in discovery responses, Thompson identified a number of other incidents of racism that he does not address in his briefs on appeal. At his deposition, Thompson could not recall when any of these additional incidents occurred, except that they all occurred between several months to a year or more *before* the March 2006 briefing. At a briefing held sometime before March 2006, Sergeant Coleman told Officer Cobb that he could not eat during the briefing, though Thompson and Cobb had observed White officers eat during briefings without reproach. At another briefing within a year before March 2006, Sergeant Newton criticized

---

[2] In the trial court, Thompson, who does not claim to be gay, also complained of alleged antigay remarks and conduct. He says nothing about those claims in this appeal. We assume he has abandoned them, and we will not address them further.

Officer Cobb for not working enough overtime. At a different briefing sometime before March 2006 at which Officer Cobb was among the senior officers present, Sergeant Alfaro went in reverse order of seniority, allowing the newest officers to pick their beat assignments first. Though he does not recall who made the statements or when they were made, Thompson believes he heard someone with the Department state that Officer Cobb must have a big penis. Last, Thompson believed he heard someone with the Department say, "[I]t used to be the worst thing you could do was to educate a black man. Now the worst thing you can do is have a lazy black man with money." But Thompson could not recall who made that statement, and he acknowledged that he had no reason to believe the statement was made by a supervisor with the Department.

In April 2006, Officer Cobb stopped coming to work. Thompson told other officers that he intended to report the racism within the Department. Thompson did not say this to Sergeant Newton, but he assumed that Sergeant Newton knew he intended to report Newton's racist statements and behavior at the March 2006 briefing, because Thompson had told everyone else who attended the briefing that he was going to tell the truth about what he saw and heard.

Officer Cobb sued the Department, and in April 2006, Thompson agreed to testify on behalf of Cobb. Thompson wrote a statement in May or June of 2006 and gave it to Cobb, who was then off duty. He did not give a copy to anyone else, nor did he tell any superior officer that he planned to write, or that he had written, the statement. Thompson provided testimony in support of Cobb's discrimination case in November 2006, April 2007, and July 2007.

Lieutenant Hunt conducted an internal affairs investigation in April 2006 regarding whether Sergeant Newton made racist statements at the March 2006 briefing. Two officers who were present at the March 2006 briefing, Dave Valenzuela and Officer Van, told Thompson that Hunt interviewed them about the incident. However, Hunt did not interview Thompson, though the Department's procedures for conducting an internal affairs investigation provide that the investigating officer should obtain a statement from any witness who was present and available for interview.

Two months later, the City of Monrovia (City) retained outside counsel, Katherine Edwards, to investigate Cobb's claims. Ms. Edwards interviewed Thompson and several other employees on October 16, 2006, in connection with her investigation of Cobb's complaint of workplace misconduct. Later, in March 2007, Lieutenant Cofield interviewed Thompson a second time about the alleged discriminatory conduct toward Cobb.

The supervisor who wrote Thompson's performance evaluation for the period including July 2006 noted that Thompson was under stress for a number of reasons, including that he was working a night shift under the supervision of a sergeant whose previous criticisms of Thompson had contributed to Thompson being placed on the performance improvement plan. Thompson kept saying he thought he was going to get fired. He received five informal complaints in nine working days during a period when the Department did not receive complaints about any other officer on Thompson's shift. Management referred him to "employee assistance" to deal with his stress, which led to Thompson being sent for a fitness-for-duty exam. The director of human resources and risk management for the City, Theresa St. Peter, ordered Thompson to undergo the fitness-for-duty examination after discussing it with the chief of police. The report concluded that Thompson was competent and able to serve as a police officer. Thompson never saw any document explaining why he was sent for a fitness-for-duty examination.

Sometime in about 2006, the Department had initiated the practice of collecting customer service cards from citizens to permit them to comment on the quality of service provided by the Department. Thompson received at least 50 positive commendations from citizens after the inception of the customer service card practice. Many of these positive reports concerned several officers who responded to a call; they did not single out Thompson for commendation. But Thompson also received complaints from citizens and from his superiors. Sergeant Head reported to Lieutenant Wagnon that Thompson did not greet Head when they passed on the staircase. Thompson had not heard the greeting and considered this criticism to be absurd.

The May 2006 performance improvement program was contemplated to expire on September 16, 2006, but Captain Hunt did not take Thompson off the program in writing as was required by the contract. Thompson's 10th performance evaluation was for the period April 24, 2006, through April 24, 2007. Thompson's overall performance for this period was below expectations. The evaluation described at length and with many specific examples the ways in which Thompson had failed to comply with his performance improvement program. He still had a time management issue with his reports, and his rate of report "kickbacks" (returned to correct errors) was still too high. The kickback rate for his reports was 36 percent, even higher than it was before the performance improvement program. He made many errors in his citations. For example, Thompson often recorded an incorrect or incomplete address of the location of a citation. He wrote moving citations out of sequential order and made duplicate entries for moving and nonmoving citations. He failed to write notes on the back of his moving citations.

The biggest concern noted was Thompson's inability to realize the importance of, and to take pride in, his written work product. His supervisor noted that "judges, deputy district attorneys, defense attorneys and other investigative agencies will judge us on the quality of the reports they read. We should strive to produce the very best report we can. We should strive for excellence and perfection." But Thompson's reports reflected his attitude, and "not in a good light."

Thompson was placed on another performance improvement program on May 30, 2007. The stated reason for this performance improvement program was Thompson's "inability to meet the requirements of your last performance improvement program in the area of planning and time management, your inability to complete reports on time, the high return rate for your reports, and your lack of attention to detail and/or to the quality of your work products for the period of April 24, 2006, to April 24, 2007." Like the previous performance improvement program, this one specified the required areas of improvement to include planning, time management, productivity, and interpersonal relationships.

In June 2007, Thompson took a leave from work. On June 18, 2007, Theresa St. Peter, the director of human resources and risk management for the City, sent Thompson a letter stating that, based on a certification provided by Thompson's doctor, the City expected Thompson to be off work from June 18, 2007, through July 3, 2007. The letter stated that effective June 20, 2007, Thompson was considered to be off work under the provisions of California's Moore-Brown-Roberti Family Rights Act (Gov. Code, § 12945.1) and the federal Family and Medical Leave Act of 1993 (29 U.S.C. § 2601 et seq.). Thompson had never requested family leave, so he was "surprised and shocked" by the letter.

While he was off work, sometime in June, July or August 2007, Thompson was notified of an internal affairs investigation of Sergeant Head. Thompson had told now Captain Hunt that Sergeant Head threw away one or more customer service cards commending Thompson, rather than preserve them for Thompson's file. Captain Hunt instructed Lieutenant Wagnon to conduct the internal affairs investigation. Chief of Police Roger Johnson authorized the internal affairs investigation.

Thompson did not return to work until January 2008, but he agreed to go into the offices of the Department in October 2007 to be interviewed as part of the internal affairs investigation. Lieutenant Wagnon interviewed Thompson, with his attorney present. Thompson had not filed a written

complaint against Sergeant Head, and he never asked the Department to conduct an internal affairs investigation of his complaint about Sergeant Head.

The Department's procedures for personnel complaints and internal investigations provide in part that "[a]llegations of misconduct made by employees shall be reported to a Supervisor or Watch Commander. Reported violations may be oral or in writing. All reports of misconduct shall be reported to the Chief of Police in writing via the chain of command." As mentioned above, these procedures also provide that the investigating officer shall obtain a complete statement from any witness who is present and available for interview. Captain Hunt did not obtain a statement from Sergeant Head, however, because Thompson recanted the statements he had made during his October 2007 interview with Lieutenant Wagnon.

After the October 2007 internal affairs interview, Thompson went to his mailbox to retrieve some papers. His paychecks were automatically deposited, but he needed to get the paystubs evidencing the deposit of his last two paychecks to send to the CalPERS (California Public Employees' Retirement System) retirement fund. Thompson's box was empty, however. Later, Thompson received a message from Captain Hunt explaining that he had retrieved the papers from Thompson's box and meant to give them to Thompson when he came in for the interview, but Hunt had stepped out when Thompson was looking for his papers. Captain Hunt mailed the paystubs to Thompson, who received them two or three weeks later. Thompson had never previously asked the Department to mail any of his papers to him.

When Thompson was looking for the papers in his box, he looked up and saw Lieutenant Wagnon standing in the doorway. Lieutenant Wagnon is a large man, and he partially blocked the doorway. Thompson explained he was looking for his stuff, and Wagnon replied "in a mean, strong voice," that he had nothing to do with that. Then Wagnon said in a growl, "You better watch it and mind your own business."

About a month before these events in October 2007, Thompson filed a complaint with the Department of Fair Employment and Housing (DFEH). Thompson also filed a claim for damages (tort claim) with the City in September 2007. Both the DFEH complaint and the tort claim described the supporting facts as follows: "In November, 2006, April, 2007 and July, 2007 Matthew Thompson provided testimony in support of police officer Glenn Cobb's discrimination case. Mr. Thompson earlier provided a written document supporting Mr. Cobb's claims of discrimination. Since writing the letter and providing testimony, Officer Thompson has been retaliated against in the

terms and conditions of his employment." Neither the DFEH complaint nor the tort claim described any specific act of retaliation against Thompson. The City sent a letter to Thompson's attorney rejecting the tort claim because it was factually insufficient to permit an investigation. The City's outside counsel sent another letter to Thompson's attorney on October 19, 2007, giving notice that Thompson's tort claim was insufficient and providing him an opportunity to cure by providing specific allegations of retaliation and identifying the individuals who retaliated against Thompson.

Thompson filed a second DFEH complaint on November 20, 2007, for harassment, retaliation and failure to investigate. This complaint stated that since Thompson had filed his earlier DFEH complaint and tort claim, the City failed and refused to process his claim for damages on the pretext that it was insufficient. It also asserted that in October 2007, the City compelled Thompson to participate in a sham internal affairs investigation regarding a complaint Thompson purportedly made against another officer, which was not true. This DFEH complaint also asserted that during the October 2007 internal affairs interview of Thompson, his attorney was not allowed to object.[3] Finally, the DFEH complaint asserted that Lieutenant Wagnon made intimidating and threatening comments to Thompson.

Thompson returned to work in January 2008. The requirements of the performance improvement program were reinstituted in February 2008. Thompson filed this lawsuit on March 19, 2008. Thompson's 11th performance evaluation was for the period April 24, 2007, through August 15, 2008. This evaluation covered a longer period, 16 months rather than a year, because Thompson had been off work a few months. Again, Thompson's overall performance was below expectations. His report writing and time management skills had not improved. For example, in a petty theft report, the face page showed several obvious errors relating to the driver's license numbers of the suspect and witnesses. It took Thompson, an 11-year veteran, over an hour and 40 minutes to complete the report. Thompson took a traffic collision report on August 7, 2008, but did not turn in the citation for that report until August 15, 2008. His supervisor noted that "the continual need to closely monitor the work output of this senior member of the department has put an unnecessary strain on the supervisory resources of the department."

---

[3] Thompson's attorney played a tape recording of the October 2007 internal affairs interview during the deposition of Lieutenant Wagnon, which the court reporter transcribed. The transcript makes clear that, in fact, Thompson's attorney made many statements and objections and also asked questions of Thompson during Wagnon's interview.

On November 10, 2008, Thompson submitted a written response to his 11th performance evaluation for the period April 24, 2007, through August 15, 2008. This was the first time that Thompson had ever written a response to any performance evaluation. Thompson's response stated that he did not agree with the evaluation and that he would continue to give high quality service to the community he serves with pride. In response to a criticism about his attendance record, Thompson stated he believed he was a reliable employee. Although he used over 344 hours of sick time, he pointed out the City had agreed to reinstate all his sick time, vacation time, and holiday time used in relation to his workers' compensation claim. Other than the time related to his workers' compensation case, he stated he had not missed work for an illness for over two years. Thompson said nothing about time management or report writing. Notably, he also said nothing about discrimination, retaliation, or harassment.

## DISCUSSION

A. *There is no material factual dispute as to Thompson's claim of retaliation.*

■ To establish a prima facie case of retaliation under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA), Thompson was required to show he engaged in a "protected activity," the Department subjected him to an adverse employment action, and a causal link existed between the protected activity and the Department's action. (*Yanowitz, supra,* 36 Cal.4th 1028, 1042.) ■ To establish a prima face case of race discrimination, Thompson likewise had to show he suffered "an adverse employment action, such as termination, demotion, or denial of an available job . . . ." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) ■ If a plaintiff establishes a prima facie case of retaliation or discrimination, the employer must offer a legitimate reason for the adverse employment action, and if the employer does so, the presumption of retaliation or discrimination disappears, and the burden shifts back to the employee to prove intentional retaliation or discriminatory motive. (*Yanowitz,* at p. 1042; *Guz,* at pp. 355–356.)

Thompson claims his first protected activity occurred in April 2006, when he told his colleagues that he intended to tell the truth about racism within the Department. He contends the Department then committed seven acts of retaliation against him, including (1) the Department placed him on a performance improvement program starting May 24, 2006; (2) he was ordered to submit to a fitness-for-duty examination; (3) the Department

did not take Thompson off the performance improvement program in September 2006; (4) Thompson was "written up" for failing to say "hi" to Sergeant Head; (5) Thompson was subjected to an internal affairs investigation concerning what he claims was a false charge against Sergeant Head of destroying customer service cards; (6) Thompson was put on another performance improvement program on May 30, 2007; and (7) Thompson was deprived of his wages and benefits.

We address first the claim that Thompson was deprived of wages and benefits. There is no evidence in the record to support this claim. Thompson asserts in his brief on appeal that the City refused to pay him his salary while he was on medical leave, but there is no citation to the record to support this contention. The only record evidence is the testimony of Ms. St. Peter and Thompson, himself, to the effect that the City paid Thompson's salary and benefits while he was on leave. Thompson testified that he was expecting an attendance bonus just before he went on leave, and when he received the City's notice that he would be placed on family leave, he was concerned that would jeopardize his bonus. The City is obligated under state and federal law to designate leave as family leave where appropriate, and in any event, Thompson was free to decline to take family medical leave. Thompson testified in his deposition that he has not been demoted in pay but he has not received a work performance bonus since 2006, whereas before then, he had received "a couple of them."

We address the City's failure to pay Thompson a work performance bonus since 2006 together with our discussion of the other claimed acts of retaliation. Assuming arguendo, solely for purposes of brevity, that (1) all of the claimed retaliatory acts happened after Thompson engaged in protected activity, and (2) the acts about which Thompson complains were adverse employment actions and not merely routine personnel actions, nonetheless, the Department's motion for summary judgment rested on substantial undisputed evidence of legitimate, nondiscriminatory reasons for all its conduct.

The Department has closely supervised, counseled, and encouraged Thompson from the time he was hired throughout his career. He is an experienced veteran of the Department, who has suffered no demotion, pay cut, or discipline. Yet, for more than 11 years, Thompson has consistently performed below expectations in the areas that are fundamental to police work, including effective use of his time on patrol and accuracy and timeliness of his crime reports. Since the time he was placed under a performance improvement program in 2006, the only reasonable inference

one might draw from the Department's failure to pay him a performance bonus is that he has not earned one.

■ Thompson has offered neither direct evidence nor any circumstantial evidence from which a reasonable trier of fact might infer that the Department's consistent criticisms of his performance over the entire tenure of Thompson's career were pretextual. Thompson offered no evidence that any of the exhaustively detailed performance evaluations contained any false statements, or that he was not suffering stress when he was ordered for the fitness-for-duty exam, or that the Department deviated from any policy in conducting the internal affairs investigation of his claim that his supervisor had destroyed positive customer service cards. ■ "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at p. 356.) Since Thompson did not establish a material factual dispute as to whether the Department's conduct toward him was in retaliation for his reports of racism, the trial court properly granted summary judgment on his cause of action for retaliation.

B. *There is no material factual dispute as to Thompson's claim of harassment or of a hostile work environment.*

■ "One form of employment discrimination is harassment on the basis of race or national origin." (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129 [87 Cal.Rptr.2d 132, 980 P.2d 846]; see Gov. Code, § 12940, subd. (j)(1) [it is an unlawful employment practice "[f]or an employer . . . or any other person, because of race . . . [or] national origin . . . . to harass an employee"].) To establish a prima facie case of a racially hostile work environment, Thompson was required to show that (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the Department is liable for the harassment. (*Barrett v. Whirlpool Corp.* (6th Cir. 2009) 556 F.3d 502, 515 (*Barrett*) [tit. VII claim; Civil Rights Act of 1964 (Pub.L. 88-352 (July 2, 1964) 78 Stat. 241)]; see *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842] [FEHA environmental sexual harassment claim]; see also Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2009) ¶ 10:111, p. 10-23 (rev. # 1, 2009).)

Thompson, who is White, bases his claim of a racially hostile work environment on conduct that targeted his African-American colleague, Officer Cobb. A plaintiff like Thompson, who is not within the protected class, may

satisfy the "protected class" requirement "based on [his] association with or advocacy on behalf of protected employees." (*Barrett, supra*, 556 F.3d at p. 515.) If Thompson produced evidence that he was personally "subjected to unwelcome racial comments as a result of [his] association with or advocacy for protected employees," he would satisfy the second and third requirements (that he was subjected to unwelcome racial harassment and the harassment was based on race). (*Ibid.*)

■ To establish the fourth element—that the harassment created a hostile work environment—Thompson " 'must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee . . . .' " (*Aguilar v. Avis Rent A Car System, Inc., supra*, 21 Cal.4th at pp. 130–131.) Harassment, which may be verbal, physical, or visual and "communicates an offensive message to the harassed employee" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 [101 Cal.Rptr.3d 773, 219 P.3d 749]), " 'cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature' " (*Aguilar*, at p. 131). Whether the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment "must be assessed from the 'perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.' " (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263–264 [100 Cal.Rptr.3d 296].)

Thompson's claim of racial harassment fails for multiple reasons. First, we question whether any evidence shows Thompson was "subjected to unwelcome racial comments" or any other harassing conduct "as a result of [his] association with or advocacy for protected employees" (*Barrett, supra*, 556 F.3d at p. 515), in this case African-Americans. And unless Thompson has made such a showing, a substantial question exists as to whether he has standing to bring a hostile environment claim. (See *Childress v. City of Richmond, VA* (4th Cir. 1998) 134 F.3d 1205, 1207 (en banc) [affirming, by an equally divided vote, the dismissal of a hostile working environment claim by White male police officers who alleged gender and race-based harassment of Black and female members of the police force; trial court dismissed the claim on the ground the White male officers did not have standing under tit. VII to bring an action for discrimination directed at others]; see also *Walker v. Mueller Industries, Inc.* (7th Cir. 2005) 408 F.3d 328, 331 (*Walker*) [in a lawsuit by White union steward contending he was subjected to a hostile environment due to the racially animated harassment directed at his African-American coworkers, the court, while not reaching the standing question, observed that its earlier decision in *Bermudez v. TRC Holdings, Inc.* (7th Cir.

1998) 138 F.3d 1176, 1180–1181, "all but closes the door on the notion that an employee who observes workplace hostility but is not a member of the class of persons at whom the harassment was directed may bring a derivative claim for the harassment"].)

■ But, putting aside questions of standing, Thompson cannot prevail on his hostile environment claim because he has not produced evidence that *he* was subjected to harassing comments or conduct because of his association with or advocacy on behalf of African-Americans. As *Barrett* points out, "only harassment that was directed toward [Caucasian plaintiffs] themselves or toward others who associated with or advocated on behalf of African-American employees is relevant to our analysis, and only to the extent that [plaintiffs] were aware of it." (*Barrett, supra*, 556 F.3d at p. 515.) In short, "only harassment that specifically targeted those who associated with and advocated for African-Americans will result in an actionable hostile work environment claim for such individuals." (*Id.* at p. 516; see *Walker, supra*, 408 F.3d at p. 331 [rejecting White plaintiff's hostile environment claim for lack of proof that the harassment " 'poisoned the working atmosphere' for the plaintiff"; Walker "made no attempt to establish that the conduct was so offensive to him as a third party as to render the workplace hostile not only for him but for any reasonable employee who likewise was a bystander rather than a target of the harassment"].)

Second, even if we ignore the absence of any evidence that Thompson was the target of the harassing conduct he cites, the law recognizes a cause of action for racial harassment only if the employee can demonstrate repeated, routine acts so severe or pervasive as to create an abusive environment for any reasonable person belonging to plaintiff's racial or ethnic group. Thompson has not done that. The three discriminatory acts described in Thompson's appellate briefs were statements and gestures made at a briefing, disparaging African-Americans; the placement of the Buckwheat character on Officer Cobb's screen saver; and the comment that James Earl Ray's birthday, not Dr. King's, should be celebrated. That this extremely offensive behavior has no place in the workplace is beyond debate. There is no evidence, however, that the conduct affected the psychological well-being of Thompson.

As for the other behavior about which Thompson testified in deposition (e.g., no eating during briefing, demanding overtime, permitting junior officers to choose beats ahead of senior officers, none of which Thompson even mentions in his appellate briefs), it is no more reasonable to infer such conduct had any racial motive or content than it is to infer it was race neutral. Other race-based statements about which Thompson complained in deposition, about which he is silent on appeal, were events that Thompson did not witness, in the nature of workplace gossip which is not actionable. (See

*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519, 521 [76 Cal.Rptr.2d 547] [incidents that a plaintiff does not witness and of which he is not aware "cannot affect his or her perception of the hostility of the work environment"; "mere workplace gossip is not a substitute for proof"; rather "[e]vidence of harassment of others, and of a plaintiff's awareness of that harassment, is subject to the limitations of the hearsay rule. It is not a substitute for direct testimony by the victims of those acts, or by witnesses to those acts."].)

The Department's statements and personnel decisions concerning Thompson do not create a material factual dispute as to harassment because "[h]arassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." (*Reno v. Baird* (1998) 18 Cal.4th 640, 646 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) "We conclude, therefore, that the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 64–65 [53 Cal.Rptr.2d 741].)

█ Third, Thompson's racial harassment claim is barred by the statute of limitations. As the Department points out, the timely filing of an administrative complaint is a prerequisite to bringing an action for damages under the FEHA (*Medix Ambulance Service, Inc. v. Superior Court* (2002) 97 Cal.App.4th 109, 116 [118 Cal.Rptr.2d 249]) and, unless an exception applies, no complaint may be filed "after the expiration of one year from the date upon which the alleged unlawful practice . . . occurred . . . ." (Gov. Code, § 12960, subd. (d).) Thompson filed his complaint with the Department on September 21, 2007, so conduct before September 21, 2006, cannot serve as a basis for liability unless a statutory exception exists or the continuing violation doctrine applies. In the latter case, at least one act "that is part of the hostile work environment" must occur within the limitations period. (See *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 118 [153 L.E.2d 106, 122 S.Ct. 2061].)

Thompson contends the continuing violation doctrine applies, but does not identify in his briefs any harassing conduct that occurred within the limitations period, instead merely claiming there were "numerous incidents of harassment" to which he was subjected "over the years 2006–2008" and referring the court to the entirety of his separate statement and his response to the Department's separate statement, comprising some 65 pages. Nor does

Thompson respond, in his reply brief, to the Department's brief, which points out that all the alleged racial harassment directed at Cobb occurred no later than March 2006, more than a year prior to Thompson's DFEH complaint. In short, because Thompson can identify no act of racial harassment occurring within the year preceding his DFEH complaint, his hostile working environment claim is necessarily barred by the statute of limitations.

For all these reasons, or any of them, the trial court's summary adjudication of Thompson's causes of action for harassment and hostile working environment was proper.

C. *There is no material factual dispute as to Thompson's claim of failure to investigate harassment and retaliation.*

 Thompson contends that he raised a triable issue of fact as to his fourth cause of action for failure to investigate harassment and retaliation. An employer who knows or should have known of unlawful harassment and retaliation, and fails to take immediate and appropriate corrective action, may be liable for the resulting damages, pursuant to Government Code section 12940, subdivision (j)(1). However, because the statute does not create a stand-alone tort, the employee has no cause of action for a failure to investigate unlawful harassment or retaliation, unless actionable misconduct occurred. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 288 [73 Cal.Rptr.2d 596].) As none occurred here, we conclude that the trial court did not err in granting summary judgment on Thompson's fourth cause of action. On appeal, Thompson does not cite to any record evidence in support of his argument that the Department failed to investigate any claims.

In any event, there is no material dispute as to whether the Department investigated Cobb's complaint of race discrimination. Thompson was interviewed twice in the course of the Department's investigation, and after Cobb sued the Department, the parties conducted discovery of Cobb's claims, including taking the deposition of Thompson. Thompson never complained of any act of harassment or retaliation against *himself* until he filed his first DFEH claim and tort claim in September 2007. As stated above, Thompson offers no record evidence that the Department failed to investigate his DFEH claim or tort claim. The Department rejected Thompson's tort claim because it provided no facts and identified no wrongdoers that the Department might investigate. The Department explained in two letters to Thompson's counsel why the Department needed more information, without which it would reject Thompson's claim. The only response from counsel in the record was the filing of the complaint in this action.

## DISPOSITION

We affirm the judgment below. Respondent is to recover its costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.