Filed 6/25/13  Nelson v. Jones Day CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAKI NELSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JONES DAY,<br><br>    Defendant and Respondent. | B235720<br><br>(Los Angeles County<br> Super. Ct. No. BC413805) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge.  Affirmed.

Jaki Nelson, in pro. per., for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Tracey A. Kennedy and Jonathan P. Barker for Defendant and Respondent.

Jaki Nelson, in propria persona, appeals from the judgment entered in favor of her former employer, Jones Day, following the trial court's grant of summary judgment in favor of Jones Day. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Nelson, an African American woman, was hired by Jones Day as a legal secretary in its Los Angeles office in November 1992. She was laid off on June 15, 2010. She alleged that African American secretaries in Jones Day's Los Angeles office were subjected to disparate treatment in areas such as compensation, benefits, performance evaluations, and accusations of misconduct. She further alleged that she had been retaliated against for complaining about disparate treatment by the firm's human resources manager, Suzanne Zamel, office administrator, Lisa Takata, and human resources coordinator/secretarial supervisor, Pat Miller. She stated that she received positive performance evaluations before she complained of mistreatment based on race and filed complaints with the Equal Employment Opportunity Commission (EEOC).

Nelson asserted that the complaints of non-African American employees were addressed promptly, while hers were not. As an example, she asserted that the partner she began working for in 1997, Norman Pedersen, treated her abusively, frequently yelling at her and calling her a "bitch." She complained to the office manager, Clark Carlson, who assured her the complaint would remain confidential, but Carlson told Pedersen, which led to Pedersen yelling at Nelson again. Around 2001, Nelson asked the office administrator, Sheila McKeown, if she could work for someone else, but, according to Nelson, nothing was done.

Although Nelson alleged that nothing was done regarding her complaints about Pedersen, memos from her personnel file and copies of emails in the record

2

indicate that McKeown and Zamel responded to Nelson by email and met with her in May 2001 and July 2001 to discuss the situation. The record shows that Nelson received positive evaluations from Pedersen, and there is no indication that she was unhappy with McKeown's and Zamel's responses to her.

Nelson also alleged that she was exposed to racist comments by Jones Day employees and that her complaints about these comments were ignored. In 2001, she returned from a sick leave and asked a Caucasian attorney, Scott Behrendt, which secretary covered for her during her absence. Behrendt replied that it was "A dirty Mexican, can't you smell her?" Nelson complained to McKeown about this comment, but nothing was done. After Nelson's complaint, Behrendt began acting physically aggressive toward her and criticizing her work.

In 2004, Nelson was told by an unnamed employee that Miller, the secretarial supervisor and human resources coordinator, referred to an African American legal secretary as a "ghetto nigger." When Nelson confronted Miller, Miller did not deny using the epithet and did not apologize, but instead asked Nelson who told her about the remark. Nelson did not tell Miller. Nelson further alleged that Miller treated employees of color differently by ignoring their complaints, whereas she immediately addressed the complaints of Caucasian employees.

In 2003, Nelson saw Behrendt and Reed Aljian, a Caucasian attorney, repeatedly taunt Emery El Habiby, an African American attorney of Egyptian ancestry. El Habiby filed an EEOC complaint against Jones Day and included Nelson's name as a witness. Aljian confronted Nelson, told her he was furious with her, and asked that she no longer work with him. Although Aljian got a new secretary, he continued to demand that Nelson do work for him and on one occasion threw a paper clip at Nelson. Nelson further alleged that Aljian had a

3

violent temper, slammed papers on her desk, and had threatened to throw secretaries out the window. In addition, she alleged that Behrendt, Aljian, and another Caucasian attorney, Christopher Lovrien, made her uncomfortable by glaring at her when they would go out to lunch.

Nelson's complaints about Aljian were not addressed, so she sent an email in 2005 to Takata, Zamel, and two partners, Frederick McKnight and Elwood Lui, expressing her belief that she was being discriminated against based on her race. She did not receive a response.

In 2003 or 2004, a former secretary, Geri Abood, told Nelson that Zamel had revealed confidential information from Nelson's personnel file to Abood. Nelson complained about Zamel to David Boyce, the firm's administrative partner, but nothing was done.

In 2005, an unnamed secretary told Nelson that the secretary's salary had been $70,000 for many years. Nelson requested a raise, asserting that non-African American secretaries earned more than African American secretaries, but Zamel and Takata told her that no secretaries earned $70,000.

In 2005, Nelson made a confidential complaint to Miller that Harriet Leva, a partner, violated the firm's no-fragrance policy. Nelson asked Miller to keep her complaint confidential, but Miller told Leva, who became angry with Nelson. Nelson then complained to Takata, who told Nelson that she should have approached Leva herself. According to Nelson, Takata started yelling at her, so she walked out, but Takata then accused her of insubordination.

Nelson alleged that, from 2006 until mid-2007, Geoffrey Forgione would tell her to complete his timesheets with 7.5 hours or more of billable hours each day, but without giving her his actual time worked and the tasks performed, causing her to worry that this constituted fraudulent billing. Nelson spoke to

4

Miller about the practice, but nothing was done about it. Nelson also alleged that Forgione made derogatory comments to her that she regarded as racially motivated.

On May 23, 2007, Nelson was called into a two-hour meeting with Zamel and Takata, who allegedly yelled at her and "took turns hurling demeaning insults" at her. When Nelson asked them why they were singling her out, Zamel allegedly replied that Nelson previously had singled Zamel out, presumably referring to Nelson's prior complaint to Boyce about Zamel. Zamel allegedly also told Nelson that it was "payback" for her prior complaints about other people at the firm. Nelson told them she felt she was being singled out because of her race.

Zamel and Takata told Nelson that the four attorneys for whom she worked were unhappy with her, and Zamel accused Nelson of "time-sheet fraud, bad attendance, chronic lateness and excessive phone and Internet usage." Takata told Nelson, "Black people have come a long way and you should be ashamed of cheating the firm." Nelson alleged that no attorneys had raised any issues with her prior to this meeting and that Zamel and Takata did not allow her to review reports documenting the accusations against her.

After the May 2007 meeting, Nelson sent an email to David Williams, the firm's Human Resources Director, telling him she had experienced discrimination, retaliation, and harassment because of her race. Williams subsequently called Nelson, told her he had reviewed her personnel file, and had concluded that Nelson was at fault.

In a memo to Nelson's personnel file following the May 2007 meeting, Zamel wrote that, after receiving reports of Nelson spending excessive time on the Internet and on personal phone calls, the human resources department examined her usage and found Internet usage of six hours on four randomly selected days

and personal phone usage from 45 minutes to three hours on each of those days. Zamel further wrote that she had confirmed that Nelson did not take the initiative to ask for work from any of the four attorneys assigned to her. In addition, Miller had noticed discrepancies on Nelson's timesheets and the actual time she had arrived at work, based on her cardkey reports. The memo also stated that Nelson had arrived to work late every day in April 2007. According to Zamel's memo, Nelson agreed during the meeting to stop using the Internet for personal business, decrease her personal phone calls, report her hours accurately, arrive at work on time, and take the initiative to assist the four attorneys.

Nelson took a medical leave of absence beginning May 29, 2007, because of emotional trauma resulting from the alleged "harassment and discrimination." She filed a complaint with the EEOC in August 2007. She later alleged that she experienced retaliation when she returned to work on June 2, 2008, stating that she was assigned to work as a floater and was "ostracized and shunned" because of her EEOC complaint. In September 2008, Nelson was reprimanded for missing a training class, although others who had missed the class were not reprimanded. In November 2008, she was temporarily blocked from the email system because her name was "in the 'termination' file," although Zamel later told her this was a mistake. Nelson also was contacted by a legal recruiter who was under the impression that Nelson had been fired.

As another example of disparate treatment, Nelson stated that James Childs, a senior partner, repeatedly chastised her work performance and, at one point, snatched her glasses off her face and said, "You need to get some new fucking glasses!"

Nelson also asserted that Jones Day began to give her pretextual negative reviews in preparation for her termination. For example, in January 2009, Childs

6

and another attorney, Sophia Chang, chastised Nelson for taking too long to create file folders and for a typographical error in a letter from June 2008. Nelson alleged that, after she filed a second EEOC complaint in March 2009, she was shunned by many employees, she was refused permission to view her personnel file, and when she was allowed to view it, she noticed that she had received negative evaluations for the first time in her career.

In November 2008, Nelson received an email from Aaron Agenbroad, an African American partner who said he would be investigating her claims of harassment, discrimination, and retaliation. Agenbroad met Nelson in December 2008 and corresponded with her through January 2009. He interviewed twelve other witnesses and concluded his investigation in February 2009. Agenbroad acknowledged that a number of people raised concerns about disparate treatment by personnel in the Los Angeles office's human resources department, including the perception that they played favorites among the staff. However, he concluded that the preferential treatment was not based on race or any other protected characteristic, noting that members of many different racial groups had received preferential treatment.

In his memo summarizing his investigation, Agenbroad concluded that, although Nelson was upset by her interactions with the human resources personnel, he did not find disparate treatment of employees based on race. He further concluded that the firm's dealings with Nelson, such as monitoring her Internet usage and processing her unemployment and other benefits claims, were not tainted by racial or retaliatory animus. Agenbroad did, however, find it troubling that neither Zamel nor Takata had made any effort to investigate Nelson's prior complaints of discrimination.

Nelson filed the instant action in May 2009.  She filed a second amended complaint in September 2010, alleging eight causes of action:  (1) harassment based on race in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.); (2) discrimination based on race in violation of FEHA; (3) failure to prevent unlawful harassment, discrimination and retaliation in violation of FEHA; (4) failure to investigate racial harassment in violation of FEHA; (5) retaliation in violation of FEHA; (6) tortious discharge in violation of public policy; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress.  Jones Day filed a motion for summary judgment or summary adjudication in March 2011.

Nelson did not oppose Jones Day's motion for summary adjudication of her first (racial harassment), fourth (failure to investigate harassment), and eighth (negligent infliction of emotional distress) causes of action.  After holding a hearing, the trial court granted Jones Day's motion for summary judgment and entered judgment in favor of Jones Day.

## DISCUSSION

Appellant contends that the trial court erred in granting summary judgment as to her claims for retaliation, violation of public policy, discrimination, failure to prevent discrimination, and intentional infliction of emotional distress.[1]

---

[1]    Jones Day asserts that we should dismiss Nelson's appeal because her opening brief was filed a few days late.  However, such a dismissal is only discretionary.  (Cal. Rules of Court, rule 8.220.)  "It is the accepted policy of the courts to encourage hearings of appeals on their merits and a dismissal on technical grounds is not favored where it does not appear that the delay caused material detriment to the respondent."  (*Peak v. Nicholson* (1943) 61 Cal.App.2d 355, 359.)  Moreover, a request that an appeal be dismissed for failure to timely file a brief will be denied where the brief is already on file

8

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) "Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 754 (*Johnson*).) Because Jones Day is the moving party, it has "the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action, that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. [Citations.] If a defendant's presentation in its moving papers will support a finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that contrary to the defendant's presentation, a triable issue of material fact actually exists as to those elements or the defense." (*Id.* at p. 753.)

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination," set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Guz, supra*, 24 Cal.4th at p. 354.) The test requires the plaintiff to establish a prima facie case of employment discrimination by providing evidence that (1) he was a member of a protected class; (2) he was qualified for or performing competently in the position; (3) he suffered an adverse employment action, such as termination; and (4) some

at the time the request is made. (*Ibid.*) We therefore decline Jones Day's request that we dismiss the appeal on this ground.

circumstance indicates a discriminatory motive. (*Id.* at pp. 354-355.) The plaintiff's burden of establishing a prima facie case "is not onerous, but it does require the plaintiff to present evidence of actions taken by the employer from which the trier of fact can infer, if the actions are not explained by the employer, that it is more likely than not that the employer took the actions based on a prohibited discriminatory criterion." (*Johnson*, *supra*, 173 Cal.App.4th at pp. 754-755.) If the plaintiff establishes his prima facie case, "a rebuttable presumption of discrimination arises and the burden shifts to the employer to rebut the presumption with evidence that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at p. 755.)

"Finally, if the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her. [Citation.] The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination. [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.)

"[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. [¶] . . . [¶] As several federal courts have stated: 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the

10

employer is wise, shrewd, prudent, or competent. [Citations.]'" (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005.)

I.      *Retaliation*

Nelson's first argument is that she has raised triable issues of material fact as to her claim for retaliation. "In order to establish a prima facie case of retaliation under [FEHA], 'a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' (*Yanowitz* [*v. L'Oreal USA, Inc.* (2005)] 36 Cal.4th [1028,] 1042 [*Yanowitz*].)" (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298.) "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.)

In support of the first required element, Nelson contends that she engaged in protected activity by complaining about racial discrimination several times prior to the May 2007 meeting with Zamel and Takata. She cites Agenbroad's comment that Zamel and Takata did not investigate Nelson's prior complaints about discrimination. She also cites the email she sent in 2005 to McKnight, Lui, Takata, and Zamel, stating that she was being discriminated against by Jones Day on the basis of race. Jones Day does not dispute that Nelson engaged in protected activity.

11

Jones Day also does not dispute that Nelson suffered the adverse employment action of having her employment terminated. Jones Day does, however, disagree with Nelson's contention that she was subjected to other adverse employment actions: the May 23, 2007 meeting with Zamel and Takata, the November 2008 incident in which she was unable to access the firm email because it was reported that she had been terminated, and the report to a legal recruiter that she had been terminated.

"The inquiry as to whether an employment action is adverse requires a case-by-case determination based upon objective evidence. [Citation.]" (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 510-511 (*Thomas*).) "[T]o be actionable, the retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment. A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455.)

"'Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.' [Citation.] If every minor change in working conditions or trivial action were a materially adverse action then any 'action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' [Citation.]" (*Thomas*, *supra*, 77 Cal.App.4th at p. 511.)

Even construing Nelson's allegations liberally, the May 23, 2007 meeting, her temporary inability to access her email, and a report to a legal recruiter that she had been terminated do not constitute substantial adverse changes in the terms and conditions of her employment. Thus, the only adverse employment action Nelson

12

suffered was her termination. In order to establish a prima facie case, Nelson must establish a causal link between her protected activities and her termination.

As evidence of a causal link, Nelson relies on Zamel's alleged statement during the May 2007 meeting that Nelson was being singled out as "payback" for her having complained about Zamel and other people at the firm. Zamel's statement does not support an inference that Nelson's termination was based on her race. The context indicates that Nelson's reference to being "singled out" was a reference to the disciplinary meeting itself, which took place more than three years before Nelson's termination. Moreover, although Zamel's alleged statement may indicate a personal grudge behind Zamel's treatment of Nelson during the May 2007 meeting, it does not indicate that Nelson's termination three years after this meeting was based on race.

Nelson also argues that Agenbroad's finding that Zamel and Takata gave preferential treatment to certain employees is strong circumstantial evidence of retaliation. Agenbroad specifically stated, however, that he found no evidence that the preferential treatment was based on a protected status. Instead, he found that the preferential treatment was not based on race at all, pointing out that employees of different races received the preferential treatment.

Nelson further contends that the negative performance evaluations she received after her second EEOC complaint constitute evidence of retaliation. Although the record indicates that Nelson received generally positive performance evaluations in 2005 and 2006, evaluations of Nelson prior to her second EEOC complaint indicate that several attorneys had expressed concern with the very issues raised by Zamel and Takata during the May 2007 meeting.

For example, in 2005, Daniel Lucas rated Nelson as satisfactory or in need of improvement in most areas, stating that she was late or absent quite often. In

13

May 2007, Lovrien gave Nelson a satisfactory evaluation, but he indicated that Nelson could improve in her attention to detail, setting forth two examples of important mistakes she had made. He also stated that Nelson's attendance and timeliness needed improvement. In 2007, Forgione indicated that Nelson was satisfactory, but he wanted her to improve in her attendance, stating that she was tardy and absent too often. He also indicated that she often made personal phone calls and did not take the initiative to ask for work when she was available. Thus, contrary to Nelson's contention, her evaluations prior to her complaint and her EEOC claims were not uniformly positive, and her contention that Zamel and Takata "manufactured" the concerns they raised in the May 2007 meeting is belied by the evidence.

The only other performance evaluations in the record are the negative evaluations that Nelson cites as evidence of retaliation. Those three evaluations were completed in November 2009, which was after Nelson filed the complaint in this case and her second EEOC claim, and shortly before her termination in June 2010. The evaluations state that Nelson was not "particularly interested in being helpful," "spent most of the day on personal calls," was "never at the desk," "did not touch base," and "was not always at her desk when I needed her." The evaluations viewed as a whole indicate a consistency over the years in the concerns expressed about Nelson's performance. Because the concerns expressed by the 2009 evaluations are similar to the concerns raised in the 2005 and 2007 evaluations, they do not support an inference that the negative evaluations were completed in retaliation for Nelson's protected activity.

Nelson also contends that Jones Day actively solicited the negative evaluations about her, which would support an inference that Jones Day "was engaged in a search for a pretextual basis for discipline." (*Yanowitz*, *supra*, 36

14

Cal.4th at 1062.) There is, however, no evidence to support this contention. In fact, one of the 2009 evaluators indicated remorse about giving Nelson a bad review, expressing the possibility that she had higher standards than normal because her other secretary was "awesome." There is simply no evidence to support the inference that the negative evaluations from 2009 were pretextual.

Even if Nelson had established a prima facie case by showing a causal link between her termination and her protected activity, Jones Day has produced a legitimate, nonretaliatory reason for the adverse employment action. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.)

Jones Day submitted evidence that Nelson was terminated as part of a restructuring of the firm. In spring of 2010, the Los Angeles office had approximately 30 fewer attorneys than it had in prior years, but the number of staff was the same, and the increased use of technology had decreased the need for support staff. Lovrien, the partner in charge of the Los Angeles office, stated in a declaration that he and McKnight therefore decided to eliminate nine secretarial positions and six legal support positions.

As part of the restructuring, all of the secretaries and other support staff were eligible for termination. In order to determine who would be discharged, Lovrien asked personnel in the human resources department to rank the secretaries, based on criteria such as supervisory evaluations, ability to work on difficult assignments, attendance, and ability to work with others. Nelson was ranked in the bottom 2 out of 43 secretaries. After Zamel, Takata, and Miller completed their rankings of the secretaries, Lovrien asked for an independent review of the evaluations by Lori Bounds, who worked in Jones Day's Dallas office. Bounds conducted an analysis of the evaluations in order to determine that no race or protected category would be disproportionately affected by the layoffs. The

15

evaluations then were reviewed by Lovrien and McKnight before the final decisions were made. Nine secretaries were laid off, two of them African American. Jones Day has presented evidence showing a legitimate, nonretaliatory reason for the action. The burden therefore shifts back to Nelson to prove intentional retaliation. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.)

Nelson does not dispute that she was terminated as part of the restructuring of the firm or that the human resources personnel ranked the secretaries in order to determine which secretaries were to be discharged. Instead, she argues that the employees who ranked the secretaries had previously demonstrated bias against her by ignoring her complaints, "playing favorites," and conducting the May 2007 meeting, which she describes as a "two-hour beat down." She also points out that when Lovrien began planning the reduction in the workforce, he consulted counsel to see if Nelson could be terminated.

Lovrien stated in his deposition that, after McKnight decided to do a restructuring of the firm, Lovrien consulted counsel to ensure that it was done in accordance with the law. He also was concerned about the restructuring because of Nelson's ongoing lawsuit against the firm. The fact that Lovrien consulted counsel before laying off nine secretaries does not support the inference that the termination was prompted by a discriminatory motive.

Moreover, as discussed above, there is no evidence that Takata and Zamel were motivated by discriminatory animus in their evaluation of Nelson, other than the "payback" comment, their conduct of the May 2007 meeting, and their preferential treatment of various employees. We conclude that Nelson has failed to raise a triable issue of material fact as to her claim for intentional retaliation.

16

II.     *Violation of Public Policy*

Nelson's second argument is that she has raised triable issues of material fact as to her claim for wrongful termination in violation of public policy. Her complaint alleged that she was terminated in violation of public policy pursuant to FEHA. In opposition to summary judgment, she argued that she was terminated in retaliation for reporting Forgione's alleged billing fraud. On appeal, she relies on the alleged fraud as the basis for her claim.[2]

To establish a claim for wrongful termination in violation of public policy, Nelson must show that (1) she was employed by Jones Day; (2) her employment was terminated; (3) the violation of public policy was a motivating reason for the termination; and (4) the termination caused her damages. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641.)

Nelson's only evidence that Forgione engaged in fraud is her declaration stating that he instructed her to complete his timesheets without giving her sufficient information. Her declaration states that he provided her the client name and narrative, but not the amount of time he spent on each task. Nelson argues that the California Penal Code prohibits defrauding another person out of money, citing general theft statutes, and that the California Rules of Professional Responsibility require that lawyers act honestly in their dealings with clients. Her vague allegations do not, however, constitute sufficient evidence to raise an issue of fact as to her claim that Forgione engaged in billing fraud.

---

[2]     Jones Day argues that Nelson cannot rely on the alleged fraud because she raised it for the first time in her opposition to summary judgment. We disagree. Although she did not specifically cite the alleged fraud as to her cause of action for wrongful termination in violation of public policy, she incorporated by reference and realleged the allegation that she reported Forgione's alleged billing fraud in discussing her public policy cause of action.

17

Even if Nelson had presented sufficient evidence that Forgione engaged in fraud, she has presented no evidence whatsoever that she was terminated in retaliation for reporting this conduct. Her declaration indicates that she reported Forgione's conduct when she worked for him from 2006 until mid-2007, and she was not terminated until 2010. There is no evidence that her report of Forgione's conduct was considered at all in her termination. Nelson has failed to raise a triable issue as to her claim for wrongful termination in violation of public policy.

III.    *Discrimination Based on Race and Failure to Prevent Discrimination*

Nelson contends that her claims for racial discrimination and failure to prevent discrimination should proceed to a jury because she presented evidence that Jones Day's dealings with her were pretextual. As discussed above, Nelson has failed to show that Jones Day's actions were pretextual. She has failed to establish a claim for racial discrimination, and she cannot claim a failure to prevent discrimination if her claim for discrimination fails. (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 880.)

IV.    *Intentional Infliction of Emotional Distress*

Finally, Nelson contends that she has raised triable issues of material fact as to her intentional infliction of emotional distress claim. We disagree. "An essential element of such a claim is a pleading of outrageous conduct beyond the bounds of human decency. [Citations.] Managing personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society. A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged. If personnel management

18

decisions are improperly motivated, the remedy is a suit against the employer for discrimination." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80.)  Nelson's termination was a personnel management decision and is thus insufficient to support her intentional infliction of emotional distress claim.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.