Filed 11/14/23

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION EIGHT

| | |
|---|---|
| JORGE MARTIN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, <br><br> Defendant and Respondent. | B303509 <br><br> (Los Angeles County Super. Ct. No. BC718199) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Monica Bachner, Judge.  Affirmed.

Lazarski Law Practice and Bryan J. Lazarski for Plaintiff and Appellant.

Swerdlow Florence Sanchez Swerdlow & Wimmer, David A. Wimmer, Lori M. Yankelevits; Shaw Koepke & Satter, Jens B. Koepke, and Anne M. Huarte for Defendant and Respondent.

———————————————

This is an appeal from a trial court order granting Respondent the Board of Trustees of California State University's (CSU) summary judgment motion against Appellant Jorge Martin (Martin).  We affirm.  Martin has not adduced sufficient

evidence to dispute CSU's legitimate reason for his termination. Similarly, he presents insufficient evidence to create a dispute of fact regarding his hostile work environment claim.

## BACKGROUND

### I. Employees make complaints against Martin and CSU investigates

In 2014, CSU hired Martin as the director of university communications of California State University at Northridge's Marketing and Communications Department (the Department). Martin oversaw a team of three to five employees who produced outgoing communications for the Department. Martin reported directly to the associate vice-president of marketing and communication, Jeff Noblitt.

In March 2016, Shante Morgan-Durisseau, a CSU employee whom Martin supervised, filed a complaint with CSU's Equity and Diversity Department (E&D) against Martin and Noblitt. Morgan-Durisseau alleged racial discrimination, harassment, and retaliation by Martin and Noblitt. CSU's Executive Order 1096 sets out a policy prohibiting discrimination, harassment, retaliation, and sexual misconduct, among other prohibitions. The executive order also defines procedures for addressing complaints. After conducting an investigation, E&D concluded that Martin did not violate Executive Order 1096. Morgan-Durisseau then filed a suit against CSU on those claims.

During the 2016 fall semester, Martin supervised a temporary employee, Hansook Oh, from September 2016 to December 2016. On November 7, 2016, Oh filed a complaint with E&D alleging that Martin harassed and discriminated against Oh based on her sexual orientation.

2

Oh complained that Martin made a suggestive comment to coworker and graphic designer Maggie Sanchez. Oh alleged that Martin, Sanchez, and another graphic designer Kate Llave were discussing Halloween costumes when Martin made a comment about Sanchez dressing as a police officer by saying, "I bet she got a lot of dollar bills thrown at her that night." Llave testified that she was not participating in the conversation at the time Martin made the comment, but that she overheard what he said.

Oh also complained that Martin wanted to exclude LGBTQ-related content from the CSUN[1] Weekly. As part of CSU's commitment to diversity, the Department showcases images of various demographics, such as people of color, white people, men, and women. Martin allegedly hesitated to include a story about a gay, Black couple who are alumni because he feared it would upset conservative donors. Oh further complained that Martin kept a baseball bat in his office, and thudded his left palm with it to imply that he would hit Oh with it when she disagreed with him on a decision. Finally, Oh complained that Martin said she "needs to be a little less hungry and a little more humble" in front of a CSU student.

Martin points us to specific portions of the investigations and facts about E&D to demonstrate bias, as summarized here. First, during the investigation, the investigator Alexandra Pursley transcribed quotes from the marketing and communications coordinator, Veronica Navarro's account that Martin exhibited "machismo" because Martin "feels like women should be home." Second, Martin, in his defense, pointed to Oh's

---

[1]    CSUN is a commonly used acronym for the California State University at Northridge.

3

mental health, and Pursley's conclusion that Martin's defense was "disingenuous and objectionable." Third, the social media coordinator, Emily Olson, said she felt Martin's behavior was inappropriate on occasion but also stated Martin was "the best boss [she has] ever had." E&D also placed Olson's comment about Martin being the best boss at the end of a paragraph. Fourth, CSU employee Olivia Herstein said that Oh was delusional and that Oh attempted to speak to Herstein about Martin during the investigation of Oh's complaint. Fifth, Noblitt stated to Pursley that "it has come to his attention that Oh had had 'multiple conversations with others on the team to try and influence the investigation' and that this has 'affected the culture' of the Department." Finally, Martin points us to E&D director Susan Hua's testimony that E&D is staffed entirely by women.

After investigating, E&D issued a Complaint Investigation Report (Oh Report) on March 24, 2017. The Oh Report found that Martin did not discriminate against or harass Oh. However, the Oh Report concluded that Martin created a hostile work environment which violated Executive Order 1096. "When *taken in totality*, Mr. Martin's actions (making a remark of a sexual nature to Ms. Sanchez, repeatedly commenting on her attire, discussing females' physical appearances, making reference to employees' personal relationships and Mr. Martin indicating to Ms. Oh that the inclusion of those in the LGBTQ community is secondary to concerns as to how some alumni will react to certain content) amounted to conduct that is sufficiently severe and pervasive that a reasonable person in Ms. Oh's shoes could, and indeed Ms. Oh did consider those actions as creating a hostile and offensive work environment." E&D made this determination based on several factors, including other witnesses reporting the

4

comment about Sanchez's Halloween costume and other employees stating that Martin made inappropriate comments that made them feel uncomfortable. The Oh Report found "that based on the corroborating accounts of multiple witnesses including Ms. Oh, Ms. Sanchez, Ms. Llave and Ms. Navarro, it is more likely than not that Mr. Martin made the alleged comment about Ms. Sanchez being given money or 'dollar bills' when she told him that she had previously dressed as a police officer for Halloween."

On April 17, 2017, Noblitt and the vice-president of university advancement, Robert Gunsalus, issued a Memorandum of Counseling to Martin that ordered him to complete four hours of sensitivity training, and to attend management coaching sessions with Human Resources. The Memorandum of Counseling also stated that E&D determined that Martin created a hostile work environment and that as a role model and leader, he needed to understand his impact on others and ensure he treated "all members of the university community with respect, avoiding any situation that could be construed as harassing, discriminatory, or retaliatory." The Memorandum of Counseling concluded that "[t]here must be immediate and sustained changes" in Martin's interpersonal interactions and that a failure to change "may have a negative impact to [his] position with the university."

Oh's contract with the Department was not renewed at the end of 2016, and she was not employed by CSU when the Oh Report issued. After she was no longer employed, on May 3, 2017, Oh complained via e-mail to the president of the Local 312 union for campus employees. She outlined her complaints against Martin and how he "is not facing any real consequences

5

for his actions." Oh asked if she could "get any support from the union since [she] was a union member during that time." The record is silent regarding what if anything the union did in response to Oh's inquiry.

On October 27, 2017, Sanchez filed a complaint against Martin. In the context of Oh's previous complaint, Sanchez was the employee who reported that Martin made a comment related to dollar bills being thrown at her because of her Halloween costume. In her own complaint, Sanchez alleged different misconduct. Sanchez accused Martin of harassment because he commented on her dress by asking her, "[a]re you going to prom?" and asking her, "[w]hat is the double-income-no-kids couple up to this weekend?" Sanchez also claimed Martin was retaliating against her for being a witness in Oh's complaint.

On February 15, 2018, E&D issued its investigation report for Sanchez's complaint (Sanchez Report) concluding that Martin did not violate Executive Order 1096. Pursley stated in the report that "[t]his conclusion is not intended to condone or minimize [Martin's] conduct, which falls below the standard reasonably expected of any employee and particularly one in a leadership position."

On February 22, 2018, E&D issued a Notice of Investigation Outcome (Sanchez Notice) to Martin and copied associate vice-president of human resources, Kristina de la Vega, and Gunsalus. The Sanchez Notice was signed by E&D director, Hua. In the Sanchez Notice, Hua stated that Martin's conduct, "while inappropriate and unprofessional, did not constitute sexual harassment, gender-based harassment or retaliation." The Sanchez Notice also prohibited Martin from retaliating against the investigation's participants and requested that

Martin exercise discretion in disclosing information from the investigation.

## II.    May 2018 newspaper articles

On May 2, 2018, the CSUN's student newspaper, the Sundial, published an article detailing Morgan-Durisseau's lawsuit against CSU based on her complaint against Martin and Noblitt.  At the time the article was published, Morgan-Durisseau was no longer employed by CSU.  While the article mentions Martin, it does not mention Noblitt, even though he was named in the lawsuit.  CSU declined to comment other than stating that the lawsuit had no merit and that CSU was committed to ensuring a positive work environment.  Noblitt and Gunsalus instructed Martin not to speak publicly about the article regarding the lawsuit.

On May 9, 2018, Oh published an opinion piece titled, "How to deal with harassment in your future workplace."  While not naming Martin, the article stated that Oh filed "a complaint of harassment against a certain supervisor at the CSUN Department of Marketing and Communications."  The article ended with hashtags:  "#MatadorForLife #CSUN #MeTooHigherEd #TimesUp #NotAnymore #YesAllWomen #HarassmentsStupid #TryMe #ComeAtMeBro #FeelingHellaGood."

On May 9, 2018, Martin met with de la Vega and CSU's legal counsel Ryan Eskin.  Eskin and de la Vega told Martin that he should "keep [his] head down, work hard, and as time . . . will pass, the stench would go away."

CSU proffered evidence that CSU's response to the articles and its directives towards Martin were part of its standard practice when CSU is involved in litigation or when a CSU

employee is in the media. De la Vega testified that CSU's position has been that CSU does not comment on personnel matters. Noblitt testified that there were other instances where a CSU employee was publicly criticized, and they, like Martin, were expected to follow the advice of counsel.

After the Sundial published the May 2, 2018 article, several individuals, including alumni, wrote e-mails to the university president, Dianne Harrison, expressing concern about CSU having a culture of harassment against women and women of color. Oh testified in deposition that she forwarded the article regarding Morgan-Durisseau to some individuals who wrote letters, such as Gina Masequesmay, the chair of the Asian American Studies Department. Oh testified that Masequesmay decided to write Harrison a letter.

## III.   Martin's conversations with Emily Olson

After the Sundial published the articles, Martin spoke to Olson, Martin's subordinate, about both Oh's May 9, 2018 article in the Sundial and Olson's statements in the E&D investigation regarding Oh's complaint. Martin told Olson that Oh's Sundial article painted him "guilty as charged" of every allegation Oh made against him. Martin also told Olson that the E&D hostile work environment finding was "highly questionable." He further told Olson that the E&D investigations were biased against him. Olson testified in deposition that Martin seemed very angry with Oh and Morgan-Durisseau and said they could go back to their "pathetic lives." Olson also stated that Martin asked if she was on his side about 10 times, and it made Olson uncomfortable.

Olson met with the media relations director, Carmen Ramos Chandler, about her conversation with Martin. Olson testified that she spoke to Chandler because Olson felt

threatened and did not feel safe at work.  Olson further testified that she wanted to talk to someone to cover herself in case something happened to her.  Chandler then conveyed her conversation with Olson to Hua.  Chandler also told Hua that women in Martin's department were unhappy and worried that their jobs would be threatened if they came forward.  Hua then conveyed this information to de la Vega and Noblitt.

## IV.    Noblitt interviews employees about Martin's conduct

On May 12, 2018, Noblitt asked Olson about her conversation with Martin.  Olson told Noblitt that she did not think that the situation at the office was good.  Olson told Noblitt that she felt Martin had grouped her with Oh and Morgan-Durisseau and that Martin mentioned that he had gotten "in trouble for something [Olson] said in an interview" with E&D.  Olson said she called in sick the next day and applied for jobs.  She decided, however, to stay in her job and talked to Martin.  Olson told Martin that he should not talk to her about Oh and Morgan-Durisseau's complaints again.  Olson said she felt better after that conversation, but still felt that she was vulnerable.

In deposition, Olson testified it may have been more than just her complaint that got Martin fired.  She also testified that she sent a text message to Martin on June 12, 2018 saying, "Hey. Don't know what to say . . . hope you are okay."

Noblitt then spoke to Andrea Shelkey, an administrative analyst for the Department.  Shelkey told Noblitt that Martin speaking about the articles was inappropriate and made her uncomfortable.  Noblitt also spoke to Kevin Lizaragga, the director of University Marketing, who is another supervisor in the Department.  Lizaragga reported that additional employees

9

Llave, Meredith Atwater, and Navarro all had concerns about Martin.

## V.    CSU terminates Martin

Noblitt testified that after speaking with employees while investigating Olson's complaint, he determined that Martin could not be an effective department leader because he disregarded CSU's direction regarding professionalism; staff could not work with him; and subordinates were intimidated and threatened by him.

Noblitt and de La Vega testified that both of them decided to terminate Martin after they met to discuss his conduct on or around May 18, 2018.  For a May 22, 2018 meeting, Gunsalus, de la Vega, Noblitt, Eskin, the university advancement director, Veronica Grant, and Harrison's chief of staff, Jill Smith, received an e-mail meeting invitation.  The May 22 meeting concerned an "HR matter," but the topic of the meeting and the actual participants in the meeting are unclear.

On June 6, 2018, de la Vega and Noblitt met with Martin to inform him that CSU would be terminating him.  Prior to this meeting, CSU had not communicated to Martin its decision to terminate him.  In the meeting, Noblitt and de la Vega offered to characterize the termination as a resignation if Martin signed a severance agreement that included a release.  De la Vega prepared notes in advance of the meeting, and delivered the comments to Martin verbally.  De la Vega's notes provide, in part: "[A]s Administrators we are expected to rise above these matters and ensure we do what is best for the university. [¶] It has become apparent to us that you are not able to focus on your work and for the best interest of the university, we are at a point in

10

time in which we need to make a change." Martin did not accept the offer to resign, so CSU terminated Martin.

On June 6, 2018, CSU issued a termination letter to Martin that did not specify the basis for his termination. On June 25, 2018, Martin requested that CSU reconsider his termination. Thereafter, Martin and his counsel met with the senior employee relations analyst, Sophia Vega, and de la Vega. Martin admitted that he spoke to his immediate direct reports, two students, and others, including Lizaragga and Shelkey about the Sundial articles. In its letter declining to rehire Martin, CSU stated the basis for terminating Martin was that his "conduct negatively impacted [his] ability to lead [his] team within Marketing and Communications. [He was] no longer able to exercise discretion and clear managerial judgment and decision-making."

## VI. Procedural history

On August 16, 2018, Martin filed a complaint against CSU alleging gender, race, color, and sexual orientation discrimination under the Fair Employment and Housing Act (FEHA); race, gender, and sexual orientation harassment; and failure to prevent harassment and discrimination. Martin claimed he experienced discrimination and harassment because he is a middle-aged, light-skinned, Mexican-American, heterosexual, and cisgender male. As to his harassment claim, Martin alleged that "Defendant CSU created a hostile work environment and subjected Plaintiff to unwanted harassment on the basis of his race and sex/gender from May 2, 2018 until his termination on June 6, 2018."

On August 1, 2019, CSU filed a motion for summary judgment or summary adjudication. On October 1, 2019, Martin filed an opposition and objections to evidence. On October 10,

11

2019, CSU filed its reply and objections to evidence. The trial court heard argument on October 15, 2019 and took the matter under submission. The trial court entered the order granting summary judgment on October 28, 2019. The trial court entered the judgment on November 22, 2019.

Martin timely appealed.

## DISCUSSION

### I. Standard of review

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)

When the moving party is a defendant, it must show that the plaintiff cannot establish at least one element of the cause of action. (*Aguilar, supra,* 25 Cal.4th at p. 853.) The defendant must "present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Ibid.,* fn. omitted.) Thus, "the defendant must 'support[]' the 'motion' with evidence including 'affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice' must or may 'be taken.' (Code Civ. Proc., § 437c, subd. (b).) The defendant may, but need not, present evidence that conclusively negates an element of the

12

plaintiff's cause of action. The defendant may also present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence—as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." (*Aguilar*, at p. 855.)

On appeal from a summary judgment ruling, we review the record de novo to determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Id.* at p. 768.)

"In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' " (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.) "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Ibid.*) Thus, a reviewing court "will affirm a summary judgment if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons." (*Angelotti v. The Walt Disney Co.* (2011) 192 Cal.App.4th 1394, 1402.)

We review a trial court's ruling on evidentiary objections for an abuse of discretion. There is a split of authority on evidentiary objections made in connection with a motion for

13

summary judgment, however. The Sixth District Court of Appeal, and to a more limited degree the First District Court of Appeal, have held that some or all written evidentiary objections should be reviewed de novo. (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1450–1451; *Strobel v. Johnson & Johnson* (2021) 70 Cal.App.5th 796, 816–817.) We agree with the majority of courts which have held that the abuse of discretion standard applies. (See, e.g., *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118 ["We will follow the weight of authority and apply the abuse of discretion standard"].)

## II. The trial court correctly granted summary judgment on Martin's discrimination claims

### a. The applicable law for discrimination claims

FEHA prohibits an employer from subjecting an employee to an adverse employment action based on the employee's protected status. (Gov. Code, § 12940, subd. (a).) In evaluating claims of discrimination under FEHA, California courts apply the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214 (*Harris*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

Under this approach, if the plaintiff establishes a prima facie case supporting his or her discrimination claim, the burden of production shifts to the employer to rebut the presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse employment action. (*Harris, supra*, 56 Cal.4th at p. 214; *Guz, supra*, 24 Cal.4th at pp. 355–356.) To state a prima facie case of gender, race, color, or sexual orientation discrimination under FEHA, a plaintiff must show that: "(1) he was a member of a protected class, (2) he was qualified for the

14

position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action . . . and (4) some other circumstance suggests discriminatory motive." (*Guz*, *supra*, 24 Cal.4th at p. 355.) Thus, a plaintiff must establish a causal nexus between the adverse employment action and his protected characteristic. (See *ibid*.; see also Gov. Code, § 12940, subd. (a).)

An employer may meet its initial burden in moving for summary judgment by presenting evidence that one or more elements of a prima facie case are lacking, or the employer acted for a legitimate, nondiscriminatory reason. (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32 (*Zamora*); *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181.) A legitimate, nondiscriminatory reason is one that is unrelated to unlawful bias and, if true, would preclude a discrimination finding. (*Guz*, *supra*, 24 Cal.4th at p. 358.) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct." (*Ibid*.)

If the employer puts forth a legitimate basis for the adverse employment action, the burden of production shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer's stated reason was a pretext for unlawful animus in order to avoid summary judgment. (*Zamora, supra*, 71 Cal.App.5th at p. 32; *Husman v. Toyota Motor Credit Corp., supra*, 12 Cal.App.5th at p. 1182.) In addition, FEHA does not require proof that discriminatory animus was a "but for" cause of an adverse action, only that it was a "substantial motivating factor." (*Harris, supra*, 56 Cal.4th at pp. 229–232.) "Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true*

15

*cause* of the employer's actions." (*Guz, supra,* 24 Cal.4th at p. 361.) Ultimately, "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory [or retaliatory]." (*Ibid.*)

> **b. CSU established a legitimate reason for the termination**

The trial court held that CSU's evidence precluded Martin from demonstrating a prima facie case of discrimination as Martin could not demonstrate that he was performing competently or that discriminatory animus could be inferred. Alternatively, the trial court also concluded that even assuming that Martin could establish a prima facie case, CSU submitted unrebutted evidence that CSU terminated Martin for a legitimate, nondiscriminatory reason. We affirm the trial court's alternative reasoning that CSU established a legitimate basis for the termination, which Martin failed to rebut.

In summary, CSU's legitimate basis for the termination includes the results of various investigations. Regarding Oh's complaint, CSU initially found that Martin created a hostile work environment based on gender and counseled him to avoid harassing and retaliatory conduct. Thereafter, regarding Sanchez's complaint, CSU found that Martin did not discriminate or retaliate, but nonetheless concluded that his conduct fell below the standard reasonably expected of an employee and supervisor. CSU again warned Martin against retaliating. Finally, CSU terminated Martin after he spoke to Olson about the Oh Report and asked Olson if she was on his side. In this last investigation, additional employees expressed concern about Martin's ability to

16

manage the Department.  The trial court accurately summarized CSU's legitimate basis that Martin "created an intimidating work environment and demonstrated [Martin's] failure to make sustained changes to his conduct."

Martin does not dispute that CSU put forth evidence that the decision to terminate him was based on nondiscriminatory factors.  Instead, Martin maintains that he satisfied his burden of showing a dispute of material fact regarding CSU's rationale for terminating him.  Consequently, Martin argues that he adduced evidence that CSU's reasons for terminating him were pretextual and unworthy of credence.  (See *Guz, supra*, 24 Cal.4th at p. 357.) However, as explained below, the record does not support Martin's arguments.

### c. Martin fails to submit evidence that creates a dispute of material fact as to pretext

#### i. Martin cannot point to any shifting rationales for his termination

Martin erroneously claims that CSU did not proffer a consistent basis for his termination.  Initially, Martin wrongly claims that he has evidence of pretext because his termination letter did not identify the reason for his termination.  Martin points us to no authority that requires the reason for terminating an at-will employee to be in writing.  In addition, evidence of pretext requires " 'such weaknesses, implausibilies, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer that the employer did not act for the [the asserted] non-discriminatory reasons.' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005

17

(*Hersant*).) CSU simply choosing to refrain from listing the basis for the termination in this letter falls short of establishing these incoherencies or contradictions. (*Ibid.*) Moreover, CSU did inform Martin of the basis for his termination in a meeting with de la Vega and Noblitt prior to giving him this termination letter.

Further, regarding proof of CSU's purportedly shifting bases for his termination, Martin points to de la Vega's notes from his meeting with Noblitt and de la Vega predating his termination letter. In this meeting, CSU informed Martin that he was being terminated. De la Vega's notes emphasize that Martin was "not able to focus on [his] work." This statement, however, tracks with CSU's basis in its letter declining to rehire Martin, that Martin's "conduct negatively impacted [his] ability to lead [his] team within Marketing and Communications. [He] [was] no longer able to exercise discretion and clear managerial judgment and decision-making." De la Vega's claim that Martin was unable to focus on work is consistent with CSU's final basis for termination—that Martin was unable to be an effective manager.

Moreover, Martin's reliance on *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686 (*Mamou*) is misplaced. In *Mamou*, the Sixth District observed that defendant "never rested on a single coherent explanation for its firing of Mamou, and that several if not all of its explanations were, to put it mildly, questionable." (*Id.* at p. 716.) There, the defendant told Mamou that he was being terminated for "operating a competing business while []working for Trendwest," but then later claimed Mamou was being terminated for theft because he "stole" Trendwest's trademark. Defendant also claimed it detected "a further larceny." (*Id.* at p. 718.) Here, in contrast, CSU never

18

provided inconsistent or incoherent reasons for terminating Martin.

Finally, Martin also claims pretext because Noblitt did not speak to him prior to informing Martin that he would be terminated. However, as an at-will employee, Martin had no right to a hearing or to be informed of the allegations against him. (See, e.g., *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1536 (*McGrory*).)

### ii. Martin has not established a dispute of fact regarding whether CSU's internal investigation was pretextual

Martin argues that Noblitt did not do enough to verify the truth of the employee statements about Martin. However, Martin cannot merely show that CSU's decision could have been subject to further verification; instead, Martin must show that there were contradictions or incoherencies in CSU's proffered reason. (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)

Martin attempts to create a dispute of fact by pointing to Olson's testimony regarding her complaint that directly preceded CSU terminating Martin. Martin claims pretext because Olson testified she thought she spoke to Chandler, a CSU director, in confidence. However, Martin cannot claim that Chandler discriminated against him by simply reporting an employee's complaint of Martin. Martin also points to Olson's belief that it may have been more than just her complaint that got Martin fired, but this statement is both speculative and entirely irrelevant to pretext. Martin also argues that Olson's posttermination text message to Martin on June 12, 2018 saying, "Hey. Don't know what to say . . . hope you are okay" is evidence of pretext. Regarding this text, Olson was his former supervisee

who had no role in terminating him, so her statements expressing concern for him do not undermine the internal investigation.

Martin also attempts to create a dispute of fact by pointing to Llave testifying that she was only a bystander when she heard Martin make a comment about Sanchez's Halloween costume. However, whether Llave was a participant or a witness to the conversation does not undermine Llave's statement or the investigation. Martin does not argue that Llave was unable to hear the conversation, and Llave said she heard the conversation. Similarly, Martin attempts to find fault with Lizarraga's and Shelkey's statements to Noblitt. Shelkey told Noblitt that it was inappropriate for Martin to speak to her about the articles and that this conversation made her uncomfortable. Lizaragga reported that additional employees Llave, Atwater, and Navarro all had concerns about Martin. However, Martin points to nothing undermining their statements.

In any event, Martin has not demonstrated any incoherencies or contradictions in this internal investigation to establish potential pretext. (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)

### iii. Martin and Oh are not similarly situated

Martin argues that Oh was permitted to rally people to her side while E&D investigated her complaint. Martin further argues he was silenced and ultimately fired for speaking about the investigations and Sundial articles. To establish "pretext in this manner," Martin must show that Oh was "similarly situated" to him. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172.) He cannot do so.

*McGrory* is instructive.  There, a white male employee claimed that he was terminated for the same misconduct for which a female employee escaped discipline, based on the recommendation of a biased female investigator.  (*McGrory*, *supra,* 212 Cal.App.4th at p. 1535.)  The court held that to create an inference of discrimination under this theory, "it must appear 'that the misconduct for which the employer [disciplined] the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.' " (*Ibid*.)  "No inference of discrimination reasonably arises when an employer has treated differently different kinds of misconduct by employees holding different positions." (*Id*. at pp. 1535–1536.)

Here, Martin was a manager and Oh was a temporary subordinate.  Given that CSU explained that Martin failed to be an effective leader, this distinction is particularly meaningful here, as Oh had no management responsibilities.  (See *McGrory*, *supra,* 212 Cal.App.4th at pp. 1535–1536.)

Moreover, CSU found that Martin created a hostile work environment and cautioned him to refrain from harassing and retaliating.  After receiving this admonition and others, Martin spoke to Olson, his subordinate, questioned CSU's hostile work environment finding to her, and then repeatedly asked her if she was on his side.  In contrast, Oh discussed her complaint against Martin with coworkers.  Martin's pattern of misconduct is not comparable to Oh's single incident.  Accordingly, with Martin and Oh, CSU has "treated differently different kinds of misconduct by employees holding different positions." (See *McGrory*, *supra,* 212 Cal.App.4th at pp. 1535–1536.)

21

### iv. Martin fails to produce substantial evidence of any bias in the E&D investigation

Martin argues that Pursley's E&D investigation of Oh's complaint was biased and that E&D participated in the decision to terminate Martin. These arguments fail to establish pretext.

First, as the trial court found, Martin failed to proffer any evidence that E&D was involved in his termination decision. Martin only submits one e-mail showing that on or about May 22, 2018, a meeting took place involving Noblitt, de la Vega, Harrison, Eskin, Gunsalus, Smith, and Grant. However, none of these employees work for E&D. Moreover, it is unclear if the CSU employees even discussed Martin at this meeting. In addition, the only evidence in the record establishes that Noblitt and de la Vega decided to terminate Martin four days before this meeting.

Second, to the extent that Martin argues that CSU relied, in part, on the E&D investigations to terminate him, Martin fails to demonstrate any pretext or animus in the E&D investigations. Martin points to E&D director Hua communicating the results of the E&D investigation concerning Sanchez to de la Vega and Gunsalus. However, reporting internal investigations to Human Resources and one of Martin's supervisors is not evidence of discrimination.

Similarly, Martin's claim that Pursley's E&D investigation was faulty does not create a reasonable inference of pretext. Martin fails to articulate any specific instances where the record establishes bias. Martin claims that Pursley badgered witnesses with leading questions until they answered, but he fails to cite to any specific evidence and only cites to the entire investigation

22

report.  Martin does accurately identify that an employee accused him of "machismo" in the E&D investigation.  However, simply transcribing an employee's comment does not taint E&D's investigation.  Martin also takes issue with E&D placing Olson's statement that "Martin was the best boss she ever had" at the end of a paragraph in its report.  While it is possible to quibble with the placement of this phrase in the report, such stylistic choices are not evidence of pretext.  (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)  Martin also argues pretext because Pursley concluded Martin's comment about Oh's mental health was "disingenuous and objectionable."  However, Martin does not identify any evidence that Pursley's comment was cover for any discrimination.  In fact, Martin appears to concede that he commented about Oh's mental health.

Martin also posits a theory that Oh colluded with other employees to lie to Pursley.  While there is evidence that Oh spoke to employee Herstein while the investigation was ongoing, Herstein was not a witness to any act, such as the Halloween costume comments, for which CSU disciplined Martin.  Moreover, other than Herstein, Martin does not point to any evidence showing who else Oh spoke to during the investigation, whether any such individuals were witnesses in the investigation, or any reason to suggest any of them made false statements about Martin.  Relatedly, Martin does not undermine E&D's conclusion that he likely made the comment about Sanchez's Halloween costume, given that there were multiple corroborating witnesses and others who stated that Martin made inappropriate comments before.  Accepting Martin's theory would require us to conclude that there was a larger conspiracy taking place where Oh, a temporary subordinate, convinced multiple employees to collude

23

and lie about Martin.  This theory rests on "mere speculation, conjecture, or fantasy."  (*McGrory*, *supra,* 212 Cal.App.4th at p. 1537.)

In addition, Martin asserts that E&D is headed and staffed by women and argues that pretext follows.  On this point, Martin does not offer context as to the number of employees at E&D or how many total women work there, so we cannot discern the strength of this argument.  "[S]mall or incomplete data sets and inadequate statistical techniques" are examples of weak statistical evidence.  (*Watson v. Ft. Worth Bank and Trust* (1988) 487 U.S. 977, 996–997 (*Watson*); *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1325 (*Carter*).)

Even accepting Martin's claims that Pursley's interview methods were imperfect, he fails to offer any evidence of investigatory flaws establishing possible pretext.  (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)

### v.  Martin's statistical evidence is not probative of discriminatory motive

Martin sought to admit the following evidence:  "Since 2011, 14 complaints alleging violations of CSU Executive Order 1096 have been sustained against male employees, resulting in 10 terminations; only one has been sustained against a female employee, and CSU did not terminate her."  While the trial court excluded this evidence as irrelevant because E&D was not involved in terminating Martin, we need not decide whether the trial court abused its discretion in its ruling because the evidence Martin seeks to admit fails to create a dispute of fact.

Using statistical evidence to prove discriminatory intent in disparate treatment cases "must meet a more exacting standard." (*Foroudi v. The Aerospace Corporation* (2020) 57 Cal.App.5th 992,

24

1009 (*Foroudi*).) " ' "[T]o create an inference of intentional discrimination, statistics must demonstrate a significant disparity and must eliminate nondiscriminatory reasons for the apparent disparity." ' " (*Ibid*.) A plaintiff may not rely on a statistical sampling that contains data that is irrelevant to the plaintiff's situation. (*Guz, supra,* 24 Cal.4th at p. 367.)

Here, Martin seeks to submit incomplete data. (See *Watson, supra*, 487 U.S. at pp. 996–997; *Carter, supra*, 122 Cal.App.4th at p. 1325.) Most importantly, the data does not show how many total complaints were made against both female and male employees. Martin's data includes only the number of sustained findings. Without knowing the total number of complaints, a fact finder cannot compare the results or patterns for any investigations regarding men and women. Accordingly, the evidence is woefully incomplete and "does not meet the more exacting standard required to raise an inference of discrimination in a disparate treatment case." (*Foroudi, supra,* 57 Cal.App.5th at p. 1009.)

### vi. Martin's evidence of CSU's commitment to diversity does not create a triable issue of discriminatory motive

CSU has articulated a general commitment to diversity and uses images of diverse individuals in public materials. Martin argues that this diversity is evidence of pretext against him. However, establishing pretext requires specific and substantial evidence. (*Morgan v. Regents of University of California* (2000), 88 Cal.App.4th 52, 69.) This general evidence of CSU's public materials together with its commitment to diversity does not provide sufficient insight into the motivations of Noblitt or de la Vega, the individuals who terminated Martin. This evidence

25

when read within the record "as a whole" is insufficient to create a reasonable inference of discriminatory motive. (*Guz, supra,* 24 Cal.4th at p. 361.)

### d. Martin fails to produce evidence that Oh was a significant participant in the decision to terminate Martin

We further conclude that Martin cannot prevail under the "cat's paw" theory of liability because he fails to show that Oh significantly participated in the decision to terminate Martin.

Under the cat's paw doctrine, " '[i]f [the formal decision maker] acted as the conduit of [an employee's] prejudice—his cat's paw—the innocence of [the decision maker] would not spare the company from liability.' " (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 542 (*Reid*) [quoting *Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 402].) Under this theory, Martin must proffer evidence "that a significant participant in an employment decision exhibited discriminatory animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.)

Here, even assuming Oh harbored discriminatory animus, Martin points to no evidence that Oh played a significant role in deciding to terminate him. First, Oh was no longer employed at CSU at the time of Martin's termination. Second, as detailed above, there is no evidence that CSU terminated Martin because of the content of Oh's Sundial article. As such, Oh was not a significant participant in any decisionmaking process.

Martin incorrectly analogizes this case to *Russell v. McKinney Hosp. Venture* (5th Cir. 2000) 235 F.3d 219, where the decision maker feared for her job because a biased employee pressured the hospital to dismiss plaintiff. There, the chief executive officer's son of the employer's parent company exerted

26

leverage and was thus "not an ordinary coworker." (*Id.* at pp. 226–228.) Martin claims that Oh exerted similar influence and leverage over Noblitt because Noblitt fired Martin to appease Oh so that Noblitt would not be the target of the next Sundial article. Even setting aside that Oh was no longer employed at CSU, Martin points to no evidence that creates a reasonable inference that Noblitt terminated Martin for this speculative reason. Martin further claims that Oh, a nonemployee at the time, exerted influence by asking some individuals to write letters to the president's office expressing concern about the culture at CSU. Even assuming this to be true, there is no evidence that the content of the Sundial articles or Oh's request for letters had any effect on CSU's decision to terminate Martin. Finally, Martin fails to proffer evidence that Oh's union complaint influenced CSU's decision to terminate him, so this theory also fails. A "party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.'" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144–1145.) Martin fails to do so. Accordingly, Martin cannot prevail under the cat's paw theory.

## III. The trial court correctly granted summary judgment on Martin's FEHA harassment claims

### a. Applicable law to FEHA harassment claims

To establish a prima facie case of unlawful harassment under FEHA, a plaintiff must show "(1) he was a member of a protected class; (2) he was subjected to unwelcome . . . harassment; (3) the harassment was based on [the plaintiff's membership in an enumerated class]; (4) the harassment unreasonably interfered with his work performance by creating

27

an intimidating, hostile, or offensive work environment; and (5) [CSU] is liable for the harassment." (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876 (*Thompson*).) CSU is liable only "if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (j)(1).)

A showing that harassment created a hostile work environment requires a showing " 'that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee.' " (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130–131; see also Gov. Code, § 12923, subds. (a) & (b).) "The law prohibiting harassment is violated '[w]hen the workplace is permeated with discriminatory intimation, ridicule and insult that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' " (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263 (*Nazir*).)

### b. Martin fails to create a triable issue of material fact as to his FEHA harassment claim

The trial court determined that Martin's FEHA harassment claim was limited to events occurring from May 2, 2018 to June 6, 2018 based on the allegations of the complaint. Martin only alleged that the publication of the Sundial articles and CSU's reaction to those articles are what constituted harassment. We agree with the trial court that the pleadings limit Martin's theory of liability. We further conclude that even considering additional conduct prior to May 2, 2018, Martin fails

28

to create a material dispute of fact that he was harassed based on any protected characteristic.

The pleadings play a key role in a summary judgment motion and " ' "set the boundaries of the issues to be resolved at summary judgment." ' " (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 289.)  "A party may not oppose a summary judgment motion based on a claim, theory, or defense that is not alleged in the pleadings," and "[e]vidence offered on an unpleaded claim, theory, or defense is irrelevant because it is outside the scope of the pleadings." (*California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 637, fn. 3.)

Martin's complaint alleged that "Defendant CSU created a hostile work environment and subjected Plaintiff to unwanted harassment on the basis of his race and sex/gender from May 2, 2018 until his termination on June 6, 2018."  The allegations in the complaint only put CSU on notice that the alleged harassment took place during this period.  (See *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444.)  Nor did Martin seek to amend his complaint to allege conduct prior to May 2, 2018.  (See *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1186.)  Thus, Martin cannot now claim that conduct prior to May 2, 2018 constituted additional harassing conduct.  Accordingly, we consider whether the Sundial articles and CSU's response to the articles qualified as harassment.

Martin's harassment claim fails for several reasons.  First, Martin contends that the hashtag "#comeatmebro" in Oh's article was harassment based on him being male.  However, the gender-based nature of this hashtag is ambiguous at best, and the article did not mention Martin by name.  Here, a single hashtag, which

was part of a series of neutral or anti-sexual harassment hashtags (#MatadorForLife #CSUN #MeTooHigherEd #TimesUp #NotAnymore #YesAllWomen #HarassmentsStupid #TryMe #ComeAtMeBro #FeelingHellaGood) is not sufficiently severe or pervasive to constitute gender harassment.  Our Supreme Court has even observed that "the term 'bitch' is not so sex-specific and derogatory that its mere use necessarily constitutes harassment because of sex." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 282–284, 295.)  Further, Martin argues that women of color at the Department labelled CSU as a "boys club," but Martin does not identify anywhere in the record that anyone made this comment.  As noted above, Navarro's comment to Pursley that Martin exhibited "machismo" was not made to Martin and there is no evidence that he was aware of this comment while he was employed at CSU  (See Gov. Code, § 12940, subd. (j)(1).)  Consequently, Martin cannot allege harassment based on this "machismo" comment.  (See *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519, 521.)

Moreover, to the extent Martin bases a harassment claim on the Sundial articles, neither Morgan-Durisseau nor Oh were employed by CSU when the student newspaper published the articles.  As such, CSU is only liable if it "knows or should have known of this [harassing] conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (j).)  First, the articles are not harassing.  As discussed above, the article written by Oh containing a "#ComeAtMeBro" hashtag is not actionable harassment.  As to the May 2, 2018 article about Morgan-Durisseau's lawsuit, Martin's only claim of harassment is that Noblitt and Chandler shielded Noblitt from negative publicity as he was not mentioned in the article even

30

though he was named in Morgan-Durisseau's lawsuit. But this claim is entirely speculative as there is no evidence why Noblitt was not mentioned in the article. Second, Martin does not allege that Noblitt was protected because he possessed any characteristics that Martin did not, i.e., nonmale, nonheterosexual, nonwhite-presenting. Accordingly, the Sundial articles cannot constitute actionable harassment.

Martin further fails to articulate how CSU's response to the Sundial articles was harassment based on Martin's protected characteristics. CSU explicitly defended Martin by stating that the Morgan-Durisseau lawsuit had no merit and that it would defend against the unfounded allegations. More pertinently, Martin's perception that the response was weak and "boilerplate" is not evidence that CSU's response was based on Martin's protected characteristics.

Martin also does not identify any evidence creating a reasonable inference that directing Martin to refrain from discussing the articles was harassment based on any protected characteristic. Instead, CSU proffered evidence that this instruction was based on its standard media policies. Further, Martin fails to point to any other evidence that CSU's direction was based on any protected characteristic.

Even considering additional alleged conduct outside the scope of the pleadings, Martin does not identify conduct constituting harassment. As to Oh's complaints and E&D's investigation of those complaints, this Division previously explained that an employer's "statements and personnel decisions" concerning an employee do not create a material factual dispute as to harassment because "[h]arassment is not conduct of a type necessary for management of the employer's

31

business or performance of the supervisory employee's job."
(*Thompson, supra,* 186 Cal.App.4th at p. 879 [quoting *Reno v. Baird* (1998) 18 Cal.4th 640, 646].)  As the entity that investigates complaints against employees, E&D was required to investigate any complaints against Martin as part of its normal personnel practices.  (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 64–65.)  Moreover, Martin fails to create a reasonable inference that CSU used the investigations to communicate "a hostile message" based on any protected characteristic.  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707.)  E&D was simply carrying out its function to investigate complaints of harassment and discrimination.

We recognize the Legislature admonishes that "[h]arassment cases are rarely appropriate for disposition on summary judgment."  (Gov. Code, § 12923, subd. (e); see *Nazir*, *supra*, 178 Cal.App.4th at p. 286.)  But rarely is not the same as never, particularly in situations where there is no evidence of conduct that would constitute actionable harassment.  Here, the trial court correctly concluded this claim was subject to summary judgment.

## IV. The trial court correctly granted summary judgment on Martin's failure to prevent harassment and discrimination claim

Because Martin cannot prevail on his harassment and discrimination claims, the trial court correctly granted summary judgment on Martin's failure to prevent harassment and discrimination claims.  "An actionable claim under section 12940, subdivision (k) [for failure to prevent discrimination or harassment] is dependent on a claim of actual discrimination [or

32

harassment].” (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021.)

## V. Martin forfeited his appeal of the trial court's evidentiary rulings

The trial court sustained CSU's objections Nos. 2, 7, 10, 12, 13, 15, 17 to the Declaration of Bryan J. Lazarski. Martin argues that we should conduct de novo review of these rulings because the trial court did not articulate the bases for the rulings. Here, however, the trial court sustained CSU's objections, and CSU set forth its bases for its objections in its filings. As such, it is not accurate to conclude that the bases for the trial court rulings are not discernable. Moreover, our Supreme Court has only cautioned that when a trial court entirely fails to rule on objections made in a summary judgment motion, the objections are deemed overruled and they are preserved for de novo appellate review. (See *Reid*, *supra,* 50 Cal.4th at p. 534.) That is not what occurred here.

Like any other claim of error, Martin is required to support evidentiary issues on appeal with argument and authority as to why, under the proper standard of review, the court erred. Martin must also explain how the error was prejudicial. (*York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1190.) Martin has failed to conduct this essential analysis and presents no further argument on this point in his reply brief. Here, Martin does not identify the evidence where the trial court purportedly erred in sustaining objections, and why the bases for sustaining CSU's objections were erroneous. Thus, his unspecified challenges to the trial court's rulings on the Lazarski declaration fail.

More specifically, Martin does argue that "to the extent [the rulings] applied to emails," they should be admitted as records by public employees. However, Martin does not specify which e-mails and why each ruling was error, so these arguments fail as well.

Finally, Martin further argues that the Sundial articles should not have been excluded because they were self-authenticating. As CSU points out, the trial court did not exclude the Sundial articles. In summary, Martin's challenges to the trial court's evidentiary rulings fail.

## DISPOSITION

The order granting CSU's motion for summary judgment is affirmed. The parties shall bear their own costs.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


34